**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JOE BUICE,

    Plaintiff,

v.

SHERIFF JONATHAN KEITH TAYLOR
and CHIEF CLEOPHAS ATWATER,

    Defendants.

CIVIL ACTION FILE

No. 1:22-CV-02366-SCJ

## O R D E R

This matter is before the Court on the Magistrate Judge's Report and Recommendation ("R&R"). Doc. No. [123]. [1] The R&R recommends that Defendants' Motion for Summary Judgment (Doc. No. [90]) be denied and Plaintiff's Motion for Summary Judgment (Doc. No. [91]) be granted in part and denied in part. The Parties have filed objections (Doc. Nos. [125]; [127]), and responses thereto (Doc. Nos. [128]; [129]). Also pending is Defendants' Motion for Leave to File Reply in Support of their Objections (Doc No. [130]), which is **GRANTED**. The R&R is fully briefed and ripe for consideration by this Court.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

# I.   STANDARDS OF REVIEW

## A.   R&R

To challenge the findings and recommendations of the Magistrate Judge, a party must file with the Clerk of Court written objections which "shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis of the objection." Heath v. Jones, 863 F.2d 815, 822 (11th Cir. 1989). If timely and proper objections are filed, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The portions of an R&R to which no objection is made are reviewed for clear error only. Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006).

## B.   Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). And a factual dispute is "genuine"

2

if the evidence would allow a reasonable jury to find for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

The movant meets its burden merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the movant has met this burden, the district court views the evidence and all factual inferences in the light most favorable to the non-movant. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the non-movant then has the burden of showing specific facts of a genuine dispute that render summary judgment improper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court resolves all reasonable doubts and draws all justifiable inferences in the non-movant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court "avoid[s] weighing conflicting evidence or making credibility determinations." Stewart v. Booker T.

3

Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000). When the record could not lead a rational trier of fact to find for the non-movant, there is no genuine dispute for trial. See Fitzpatrick, 2 F.3d at 1115–16.

## II.    BACKGROUND

There are no objections to the Material Facts section of the R&R. Therefore, the Court has included the content of that section below.

### A.    Plaintiff's Employment with the GCSO

Plaintiff, a white male, is a former employee of the Gwinnett County Sheriff's Office ("GCSO"), and he was a lieutenant at the time of his separation. Doc. No. [105-2], ¶ 1; Doc. No. [112-1], ¶ 1. Plaintiff was employed with the GCSO for over 22 years, from November of 1998 through March 26, 2021. Doc. No. [103], ¶ 2. In or around August of 2012, Plaintiff was suspended for three days for admittedly lying during an administrative investigation, in violation of the GCSO's truthfulness policy. Doc. No. [105-2], ¶ 2. In or around January of 2013, Plaintiff was suspended for one day for violating leave policies. Id. at ¶ 3.

From approximately February of 2018 through approximately June 22, 2020, Plaintiff served as the Commander of the Rapid Response Team (RRT), a unit which—among other tasks—responded to medical emergencies and fights in the Gwinnett County Jail. Id. at ¶ 4; see also Doc. No. [112-1], ¶ 3. When an

4

inmate is engaging in violence or is otherwise non-compliant in a way that endangers himself or others, RRT members have several physical maneuvers they have been trained in that can immobilize the inmate or create enough pain to induce compliance. Doc. No. [112-1], ¶ 8. One such maneuver is the "leg lock" or "leg control" technique, which is a way of applying pressure to an inmate's leg to create enough pain to induce an inmate to comply. Id. The purpose of the leg lock technique is to induce physical compliance with jail staff's orders. Id. at ¶ 9. To use the technique for other purposes, such as to get an inmate who is physically complying to stop talking, is inappropriate and an excessive use of force, and RRT members were not taught to use this technique to make inmates stop talking if the inmates were physically complying with orders. Id.

Plaintiff was also an instructor for the GCSO, and he trained members of the RRT, including training them in the leg lock technique. Doc. No. [112-1], ¶ 10. For each course they teach, instructors are required to provide documentation to the GCSO's training division of the content of their training and who attended the training course. Id. at ¶ 11. This is usually accomplished by providing a roster and either a cover sheet or, at times, a full lesson plan to the training division. Id.

In or around January of 2013, Plaintiff created a lesson plan of tactics he would teach to the RRT, including the leg lock technique, and he submitted this

lesson plan for review and approval to then-Captain Frank Woods, who was an Assistant Commander of the RRT at the time. Id. at ¶ 12. Woods reviewed and approved the lesson plan. Id. In or around November of 2018, Plaintiff revised that lesson plan, which still included the leg lock technique, and again submitted it for review and approval to Woods (then either the Jail Commander or Assistant Jail Commander at the Gwinnett County Jail), who approved the lesson plan. Id. at ¶ 13. Plaintiff also submitted the lesson plan to the training division when he created it and when he made significant revisions, including the November of 2018 revision. Id. at ¶ 14. When he submitted the lesson plan to the training division, Plaintiff typically submitted it in person to the secretary or receptionist at the entrance to the division because it was too large to email; he did not submit it to the Director of the training division. Id. at ¶ 15.

## B.    The Hicks Leg Lock Incident in May of 2020

On May 5, 2020, Andy Hicks, a member of the RRT, initiated a leg lock pain compliance technique on inmate Robert Rashawn Green, who is Black, for the purpose of making him stop talking (the "Hicks incident"). Doc. No. [105-2], ¶ 8; Doc. No. [112-1], ¶¶ 16, 18; see also Doc. No. [99] at 74:16–25. Plaintiff was not present for the Hicks incident. Doc. No. [112-1], ¶ 17. When a use of force occurs, it is typically reviewed by the supervisor on shift, and Plaintiff (as Commander

of the RRT) would only be notified of the use of force if the shift supervisor flags the incident as a potential problem. Id. at ¶ 19. The shift supervisor during the Hicks incident approved Hicks's use of force against Inmate Green, so Plaintiff was not made aware of the Hicks incident until early June 2020 when someone from the Sheriff's Professional Standards Unit (PSU) reviewed the video footage and informed Plaintiff and the RRT that there was a concern. Id. at ¶¶ 20, 21.

The PSU subsequently opened an internal investigation into the Hicks incident on June 2, 2020. Doc. No. [105-2], ¶ 9; Doc. No. [112-1], ¶ 22. One of Plaintiff's deputies in the RRT (Deputy Bogus) first accessed bodycam footage of the Hicks incident that same day, June 2, 2020. Doc. No. [112-1], ¶ 23. On June 3, 2020, Deputy Bogus and Deputy Osnowitz accessed bodycam footage of the Hicks incident. Id. at ¶ 24. Also on June 3, 2020, Plaintiff suspended Hicks and another deputy involved in the Hicks incident from the RRT pending the PSU's investigation of the use of force. Id. at ¶ 25. Plaintiff, as RRT Commander, had no duty to investigate incidents involving team members' use of force, to review all videos regarding a use-of-force incident, or to interview team members regarding such an incident, as those duties were the responsibility of the PSU. Id. at ¶ 27. Plaintiff's sole responsibility regarding uses of force was to review those

7

that had been flagged as problematic with a focus on training and identifying issues of concern. Id. at ¶ 28.

The PSU asked Plaintiff to sit for an interview, but then-Sheriff Conway instructed Plaintiff not to be interviewed because Plaintiff had not been present at the time of the Hicks incident. Doc. No. [105-2], ¶ 10; Doc. No. [112-1], ¶¶ 29, 32, 33. Plaintiff followed Sheriff Conway's order and did not sit for an interview during the PSU investigation. Doc. No. [112-1], ¶ 35. At the conclusion of the PSU investigation of the Hicks incident, Sheriff Conway issued a Notice of Intent to Terminate Deputy Hicks, who then resigned in lieu of termination. Id. at ¶ 36. The Hicks incident and its resulting media attention occurred around the time that law enforcement agencies around the country were facing protests related to police brutality following the murder of George Floyd. Doc. No. [105-2], ¶ 11.

On or around June 22, 2020, prior to Sheriff Taylor's election and Chief Atwater's hiring, Plaintiff left the RRT and was reassigned to the family violence section, which was one of the units to which he was assigned in January of 2021. Doc. No. [105-2], ¶ 12. Plaintiff's other roles at the end of his tenure with the GCSO included the Sex Offender Unit, the Dignitary Protection Detail, and the Mobile Field Force. Id.

8

## C.    Taylor's Election and Assumption of Sheriff Position

At the time of the Hicks incident, Defendant Taylor was campaigning for Gwinnett County Sheriff, in part on the promise to make the Sheriff's department "reflect[] the diversity in Gwinnett County" and that his "command staff would be reflective of the community." Doc. No. [90-9], 39:14–40:2; see also Doc. No. [112-1], ¶ 38. Defendant Taylor won the election in November of 2020 and became the new Sheriff of Gwinnett County on January 1, 2021. Doc. No. [105-2], ¶ 13; Doc. No. [112-1], ¶ 42. Effective January 1, 2021, Defendant Atwater was appointed to the position of Assistant Director and Chief Deputy of the GCSO. Doc. No. [105-2], ¶ 14.

When Sheriff Taylor took office, he reorganized the command staff, with a special concern toward its racial diversity, which he testified changed "dramatically." Doc. No. [112-1], ¶ 44. After Sheriff Taylor's reorganization, seven of the nine people with the title of "Chief" were non-white. Doc. No. [112-1], ¶ 45. Between October 1, 2020, and April 1, 2021 (three months into Taylor's term), the total number of employees in the Sheriff's Office decreased by 22, the number of White employees decreased by 25, and the number of Black employees stayed the same. Doc. No. [112-1], ¶ 46.

### D.   Second PSU Investigation of Hicks Incident

Sheriff Taylor, Chief Atwater, and Assistant Chief Melanie Jones learned in early January 2021 that the Gwinnett County District Attorney's Office planned to submit the Hicks incident to a grand jury for consideration of indictment. Doc. No. [90-6], 30:22–31:10; Doc. No. [90-9], 56:14–57:5; Doc. No. [90-12], 22:14–23:21; see also Doc. No. [112-1], ¶ 50. Chief Atwater ordered Assistant Chief Jones (a Black female) to have a second PSU investigation into the Hicks incident performed, and Assistant Chief Jones ordered then-Major Renee Walker (a White female) to conduct the investigation. Doc. No. [105-2], ¶¶ 19, 20; Doc. No. [112-1], ¶ 50. The Hicks incident was the only investigation Sheriff Taylor and Chief Atwater ordered to be re-reviewed at that time. Doc. No. [112-1], ¶ 51. Chief Atwater told Assistant Chief Jones that "he wanted to make sure [Hicks's potential indictment] didn't put us in a bad light where we would stand wherever it came out in the news, because there was a lot going on in the news at the time." Id. at ¶ 52. Chief Atwater testified that one of the reasons he ordered the second PSU investigation into the Hicks incident was because "we had supervisors that were still here that were part of the initial incident in leadership positions." Id. at ¶ 53.

Plaintiff, who contracted COVID-19 on or about December 23, 2020, was out of work to self-isolate between that time and January 6, 2021, before returning to work on January 7, 2021. Doc. No. [105-2], ¶ 16; Doc. No. [112-1], ¶ 47. On January 5, 2021, while Plaintiff was on COVID leave, Defendants took Plaintiff's office, notified him that his office was being given to someone else, and put the contents of his office into boxes and garbage bags. Doc. No. [112-1], ¶ 48. The GCSO took Plaintiff's take-home duty vehicle around the same time. Id. Plaintiff was never given a new office assignment. Id. at ¶ 49.

The second PSU investigation into the Hicks incident was initiated January 4, 2021, and listed Plaintiff as one of the "Subject[s] of Complaint." Doc. No. [112-1], ¶ 54; see also Doc. No. [90-4] at 69–70. Assistant Chief Jones testified that there were no discussions about Plaintiff's race or the races of anyone else involved when the decision was made to conduct the second PSU investigation. Doc. No. [105-2] at ¶ 21. Plaintiff was placed on paid administrative leave effective January 7, 2021. Id. at ¶¶ 23, 24. On January 14, 2021, Major Walker conducted a videotaped interview of Plaintiff. Doc. No. [112-1], ¶ 55; Doc. No. [105-2], ¶ 24. During this interview, Plaintiff was asked why he did not sit for an interview during the original PSU investigation, and he explained that then-Sheriff

11

Conway had ordered him not to be interviewed. Doc. No. [105-2], ¶ 25; Doc. No. [112-1], ¶ 56.

Also during that interview, Major Walker asked Plaintiff whether he had reviewed body cam videos of the Hicks incident on June 3 when he discussed the incident with Major Frank Woods, and Plaintiff responded that—at that time—he had not seen any bodycam footage and had only seen Central video footage with no audio. Doc. No. [112-1], ¶ 57. Major Walker asked what video footage Plaintiff had seen at the time that he wrote the June 4, 2020, Use of Force Review memo, and Plaintiff responded that he had not seen all the videos, but that he had seen "a Central video and one bodycam video," and he believed the bodycam video was from Deputy Bello-Lockward and was the bodycam "facing the deputy's desk." Id. at ¶ 58. Plaintiff told Major Walker that he did not remember if he had seen certain portions of the video footage or what else he may have seen. Id. at ¶ 59. Major Walker wrote in her report that, when asked if he had reviewed the body cam videos of the Hicks incident, Plaintiff responded:

> I saw one Central video of the incident but I didn't get to see any body cam incident. So based on what I saw on the Central video there is no sound there is no anything I just kind of watched you're watching what's going on . . . So I guess the whole thing is if you watch the video without sound and you don't know what is going on the techniques are approved but the reason they used them is what I had an issue with.

Doc. No. [105-2], ¶ 26.

During the interview, Major Walker asked Plaintiff if the leg lock technique used by Hicks during the incident was an approved tactic, and Plaintiff responded "yes" and further stated, "I submitted my lesson plans to [the training division] . . . Everything utilized all the techniques we have been doing for the past twenty years I have lesson plans for, we have been teaching them for twenty years and they are submitted for training." Doc. No. [105-2], ¶ 27; see also Doc. No. [112-1], ¶ 60. Plaintiff explained that he only submitted a new copy of the lesson plan to the Training Division when he made changes to it, and he argued that the fact that he had submitted leg lock lesson plans to the Training Division for years without any objection meant that the leg lock was an approved use of force. Doc. No. [112-1] at ¶ 61. Plaintiff did not assert that he had submitted the lesson plans to the Training Director (then Michael Kotowski). Doc. No. [112-1], ¶ 60. Plaintiff offered to provide Major Walker with a copy of the lesson plan, suggested a copy of the approved lesson plan might be found in the RRT's vault, and invited Walker to look for the lesson plan in the vault and identified the location of the vault. Id. at ¶ 62.

Neither Major Walker nor anyone else at the GCSO followed up on Plaintiff's offer to provide a copy of the lesson plan or looked for an approved copy in the RRT vault or in Plaintiff's office. Doc. No. [112-1], ¶ 63. Major Kotowski told Major Walker that the Training Division did not teach the leg lock technique utilized in the Hicks incident, and he denied ever receiving any lesson plans related to that technique from Plaintiff. Doc. No. [105-2], ¶ 28. Major Walker only asked Major Kotowski if he personally had received an applicable lesson plan from Plaintiff, and Major Kotowski answered that he had not. Doc. No. [112-1] at ¶ 64. Frank Woods, a former Director of the Training Division, testified that the Training Director does not see every lesson plan that is submitted to the Training Division and that it was probable that Plaintiff could have submitted lesson plans to the Training Division without then-Training Director Kotowski seeing or knowing about those plans. Id. at ¶ 66. Major Walker did not contact former Sheriff Conway or anyone else to confirm whether Conway had, in fact, instructed Plaintiff not to be interviewed during the first PSU investigation. Id. at ¶ 69.

In her report, Major Walker notes that two RRT deputies who were RRT assistants to Plaintiff at the time of the Hicks incident, Kevin Bogus and Nicholas Osnowitz, viewed the bodycam videos numerous times around the time that the

14

PSU had asked for Plaintiff's review (in June of 2020). Doc. No. [105-2], ¶ 29. Her report notes that she interviewed Bogus, who told her that he had reviewed video footage of the Hicks incident with Plaintiff, and Osnowitz, who stated that he assumed that he or Bogus would have reviewed the video with Plaintiff but that he did not have a clear memory of doing so. Id. at ¶¶ 30, 31; see also Doc. No. [90-4], 78–79. Major Walker then interviewed Plaintiff a second time. Doc. No. [105-2], ¶ 32. Plaintiff stated, as to whether he saw the bodycam footage, "I know this made the news and I don't remember what I saw on the news . . . I could have or I could have watched all the videos I just don't know . . . I know that we had the guys pull it up we put it on the big screen and looked at it." Id.

The Parties dispute whether Major Walker believed that Plaintiff had been untruthful with her during the second PSU investigation, both about whether he had watched the bodycam videos and whether he had submitted lesson plans for the leg lock technique. See Doc. No. [105-2], ¶¶ 33, 34. Walker testified that she believed Plaintiff had been untruthful, but Plaintiff disputes whether Walker could reasonably believe that. Walker testified that no one with the GCSO influenced or attempted to influence her about what her investigation should find or conclude, that she did not consider Plaintiff's race in drafting her report or making her findings, and that Plaintiff's race was not mentioned in her

15

subsequent discussions about her investigation with Sheriff Taylor or Chief Atwater. Doc. No. [105-2], ¶¶ 36, 37.

### E.     Notice of Intent to Terminate

Major Walker filed her report for the second PSU investigation on or about February 8, 2021. Doc. No. [112-1], ¶ 71. The Parties dispute whether Sheriff Taylor read the entirety of Walker's report and its attachments, (Doc. No. [105-2], ¶ 38; Doc. No. [112-1], ¶ 72), and Sheriff Taylor's deposition testimony on this point is unclear, (compare Doc. No. [90-9], 75:20-24 (Sheriff Taylor's testimony that he read "[e]xcerpts" of Walker's report) and Doc. No. [90-13], 39:3–21 (Taylor's testimony that he reviewed the investigative file but did not watch all of the videotapes or read all of the interview transcripts) with Doc. No. [90-9], 76:16–21 (Taylor's testimony that he read "the full thing") and id. at 105:13–18 (his testimony that he read the entire report and attachments before making the decision to fire Plaintiff)). Chief Atwater read Walker's report and watched the video of Walker's interview of Plaintiff. Doc. No. [112-1], ¶ 73.

The Parties dispute whether Sheriff Taylor, Chief Atwater, and Assistant Chief Jones believed that Plaintiff had been untruthful during the second PSU investigation, both as to whether Plaintiff had watched the bodycam videos and whether he had submitted lesson plans for the leg lock technique to the Training

16

Division. Taylor, Atwater, and Jones all testified that they believed Plaintiff had been untruthful during the investigation. Doc. No. [90-9], 65:14–20; Doc. No. [90-13], 44:1–10, 45:1–5 [Taylor deposition]; Doc. No. [90-10], 148:15–150:6 [Atwater deposition]; Doc. No. [90-12], 35:17–36:2, 38:20–41:5 [Jones deposition]; Doc. No. [90-6], 150:14–18, 157:2–13 [30(b)(6) deposition]). Plaintiff disputes whether they could have actually believed that Plaintiff lied about viewing the bodycam footage or submitting lesson plans. See Doc. No. [105-2], ¶ 39. Taylor and Atwater testified that they believed Plaintiff's failure to be interviewed during the first PSU investigation was improper. Doc. No. [90-9], 107:14–108:19; Doc. No. [90-10], 131:17–133:15. Plaintiff does not dispute that they so testified, but he does dispute whether they could believe this, as both Taylor and Atwater also testified that they knew former Sheriff Conway had told Plaintiff not to be interviewed. See Doc. No. [105-2], ¶ 40; Doc. No. [112-1], ¶ 79; see also Doc. No. [90-9], 113:6–7; Doc. No. [90-10], 132:12–19; Doc. No. [90-6], 135:1–136:21.

After the second PSU investigation, Chief Atwater recommended terminating Plaintiff, and Sheriff Taylor agreed. Doc. No. [112-1], ¶ 74. On March 22, 2021, Defendants issued a notice of intent to terminate Plaintiff, which listed three violations justifying termination: (1) "Prompt Performance of Duty/Neglect of Duty," (2) "Truthfulness/Cooperation," and (3) "Cooperation

17

With Administrative and/or Internal Investigation," but did not provide any explanation for how Plaintiff violated these rules. Id. at ¶ 75; see also Doc. No. [103], ¶ 17. Taylor and Atwater also considered and reviewed Plaintiff's two prior sustained disciplinary charges, one of which included an allegation of untruthfulness. Doc. No. [105-2], ¶ 41. Chief Atwater gave Plaintiff the Notice of Intent to Terminate, and he told Plaintiff that Defendants felt he had been untruthful and discussed Plaintiff's alleged policy violations, but he did not go "into many details" about the factual basis for what Plaintiff had allegedly done. Doc. No. [90-10], 122:18–127:7; Doc. No. [90-3], 192:21–194:2; see also Doc. No. [105-2], ¶¶ 42, 43.

The Notice of Intent to Terminate explicitly stated:

Prior to a final decision in this matter, it is my desire to consider any and all relevant information. You may meet with me to present any information you feel should be taken into consideration. . . . If you do not respond to this notice in any manner, a final decision will be made without your input.

Doc. No. [111-1], ¶ 4. Without attempting to provide additional information to Chief Atwater or Sheriff Taylor, and to avoid having a termination on his record and to retain his retirement benefits, Plaintiff retired in lieu of termination. Doc. No. [112-1], ¶ 77; see also Doc. No. [90-5], 64–66; Doc. No. [111-1], ¶ 5. Plaintiff

18

tendered his resignation notice on March 24, 2021. Doc. No. [90-5], 75; Doc. No. [111-1], ¶ 5.

Plaintiff's supervisor, then-Assistant Chief Marcelino LaBoy, was not involved in the PSU investigation or in the decision to issue Plaintiff a notice of intent to terminate. Doc. No. [105-2], ¶¶ 51, 52. Only Sheriff Taylor and Chief Atwater signed the PSU case disposition form as to Plaintiff. Doc. No. [90-5], 64–66. Plaintiff was never told by Chief Atwater or Sheriff Taylor that he was being terminated because of his race, and he has never seen anything in writing to that effect from anyone associated with the GCSO. Doc. No. [105-2], ¶ 57. Sheriff Taylor and Assistant Chief Jones each testified that race had nothing to do with any actions taken related to Plaintiff. Id. at ¶ 61. Defendants testified that no decision was made to terminate Plaintiff prior to the completion of the second PSU investigation. Id. at ¶ 63. The decision to terminate or take an adverse action against a GCSO employee is discretionary. Id. at ¶ 78. Between October 30, 2020, and December 31, 2020, Sheriff Conway's administration had 29 White employees, 6 Black employees, and 4 Hispanic employees at the rank of Lieutenant or higher; in the calendar year of 2021, Sheriff Taylor's administration had 29 White employees, 16 Black employees, and 4 Hispanic employees at the rank of Lieutenant or higher. Id. at ¶ 68.

19

In addition to his separation, Plaintiff contends that he was subjected to discrimination based on his race when his take-home duty vehicle and his office were rescinded from him while he was on COVID-19 leave. Doc. No. [105-2], ¶ 72. Plaintiff testified that he was told that his vehicle was being taken away because he was no longer in charge of the GCSO's Dignitary Protection Team. Id. at ¶ 73. When his vehicle was taken away, Plaintiff was on COVID-19 leave, and upon his return to work, he was on administrative leave. Id. at ¶ 74. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on May 20, 2021, and an amended charge on June 24, 2021, both of which indicate that he was subjected to race and color discrimination between January 1, 2021, and March 22, 2021. Id. at ¶ 79. The EEOC charges describe the adverse action as being "placed under Administrative Leave . . . and [] then forced to retire in lieu of termination (involuntary retirement) on March 22, 2021." Id.

### F.    Gwinnett County Merit System

Employees in the Gwinnett County Merit System who are terminated have the right to appeal the termination to the Gwinnett County Merit Board (the Merit Board). Doc. No. [103], ¶ 14. If the appeal is successful, the Merit Board overrules the termination, reinstates the terminated employee, and restores back pay and lost sick and annual leave. Id. at ¶ 15; see also Doc. No. [111-1], ¶ 7. As a merited

(rather than appointed) Lieutenant, Plaintiff's employment was subject to the Gwinnett County Merit System. Doc. No. [105-2], ¶ 49; Doc. No. [103], ¶ 16. If Plaintiff had been terminated, he could have appealed that decision to the Gwinnett County Merit Board, which could have reversed the decision. Doc. No. [105-2], ¶ 50; Doc. No. [103], ¶ 16.

Defendants, particularly Chief Atwater, contend that Plaintiff was not terminated when Defendants issued him the Notice of Intent to Terminate. Doc. No. [103], ¶ 18. Chief Atwater testified that Plaintiff was not terminated when he was issued the Notice of Intent to Terminate because he could have appealed the notice to the Sheriff and could have appealed the decision to the Merit Board. Doc. No. [90-10], 171:22–172:17.

### G.    Secret Recording

After Defendants issued the Notice of Intent to Terminate, Plaintiff secretly recorded the March 22, 2021, meeting he had with Chief Atwater and another supervisor about that Notice. Doc. No. [103], ¶ 20. During Plaintiff's deposition, on February 21, 2023, Plaintiff revealed that he had secretly recorded the March 22, 2021, meeting with Chief Atwater. Doc. No. [111-1], ¶ 8. Chief Atwater testified that this covert recording was in violation of GCSO policy and provided a basis for discipline, up to and including termination. Doc. No. [103], ¶ 22; Doc.

No. [111-1], ¶ 9. Therefore, Atwater testified that, had he known about the recording, he would have "recommended or issued a Notice of Intent to Terminate for that additional reason." Doc. No. [103], ¶ 23; see also Doc. No. [111-1], ¶ 10. Following issuing a Notice of Intent to Terminate, Chief Atwater would have terminated Plaintiff for covertly recording their conversation in violation of the GCSO's "Covert Recording of Co-Workers" policy, although Plaintiff would have had the right to appeal that Notice to the Merit Board. Doc. No. [111-1], ¶ 11; Doc. No. [103], ¶ 24. Chief Atwater and Sheriff Taylor do not know whether the Merit Board would have overruled or sustained the termination. Doc. No. [103], ¶¶ 25, 26. On May 12, 2023, Chief Atwater issued a Notice of Termination to former employee Herman Ragsdale for violating GCSO policies, including the "Covert Recording of Co-Workers" policy. Doc. No. [111-1], ¶ 13.

## H. Compensation and Post-Termination Actions

As of the date of his termination, Plaintiff's base salary with the GCSO (exclusive of benefits) was $89,969.00 annually. Doc. No. [103], ¶ 6. He also earned additional income from the GCSO by working overtime. Id. at ¶ 7. In 2020, the last full calendar year before his termination, Plaintiff's combined base salary and overtime pay was $118,989.70. Id. at ¶ 8. In addition, while he was employed with the GCSO, Plaintiff was occasionally hired by private entities seeking the

services of an off-duty law enforcement officer. Id. at ¶ 9. In 2020, Plaintiff earned approximately $6,275 in off-duty work for private entities. Id. at ¶ 10.

The Georgia Peace Officer Standards & Training Council (POST) is the agency that certifies law enforcement officers in Georgia. Doc. No. [103], ¶ 27. Law enforcement agencies in Georgia are required by POST regulations to report to POST every termination or resignation/retirement taken in lieu of termination. Id. at ¶ 29. Defendants reported to POST that Plaintiff had retired in lieu of termination. Id. at ¶ 28; see also Doc. No. [111-1], ¶ 15. POST then conducted an investigation as to whether Plaintiff's law enforcement credentialing should be revoked and ultimately concluded, on December 8, 2021, that "no action" would be taken against Plaintiff. Doc. No. [103], ¶¶ 30, 31; Doc. No. [111-1], ¶ 18. Plaintiff remains POST certified. Doc. No. [111-1], ¶ 18. The GCSO does not play a role in POST's decisions to investigate peace officers, and the GCSO does not have authority to interfere in or conclude a POST investigation. Id. at ¶ 16.

After more than two decades in law enforcement, Plaintiff considered law enforcement to be his job, and he therefore initially concentrated his job search on law enforcement jobs. Doc. No. [103], ¶ 32. To find a job in law enforcement, Plaintiff contacted the various law enforcement contacts ("chiefs and sheriffs") that he had developed over his decades-long career and inquired about job

openings. Id. at ¶ 33. Every law enforcement contact told Plaintiff the same thing—that they could not hire him while he was under investigation by POST and that he had to wait for POST to clear its investigation. Id. at ¶ 34. However, even after the POST investigation was concluded, Plaintiff's law enforcement contacts told him that they could not hire him because his POST file still said that he had retired in lieu of termination and because that file reflected that the GCSO had classified him as "not eligible for rehire." Id. at ¶ 35.

Starting in November of 2021, Plaintiff worked part-time for JDS Holding, LLC, providing security and driver services for which he was paid $250 per day. Id. at ¶ 36; see also Doc. No. [111-1], ¶ 17. Plaintiff began full-time employment with United Tactical System, LLC, in January of 2022 (the month after POST concluded its investigation), providing training to law enforcement on de-escalation and non-lethal use of force. Doc. No. [103], ¶¶ 37, 38; Doc. No. [111-1], ¶ 19. When he was hired by United Tactical, Plaintiff was paid an annual salary of approximately $65,000, and he received a raise in August of 2022 to $72,500 and another raise in March of 2024 to $95,000. Doc. No. [103], ¶¶ 39–41; Doc. No. [111-1], ¶ 19. Plaintiff testified that, prior to being hired by United Tactical, he verbally "talked to chiefs and sheriffs" but he did not "fill[] out [formal]

24

application[s]" for any jobs with law enforcement agencies. Doc. No. [90-3], 270:22–272:23; see also Doc. No. [111-1], ¶¶ 20, 22.

During discovery in this case, Plaintiff asked Defendants in an interrogatory to identify every additional effort Plaintiff was obligated to expend to locate comparable employment, and Defendants responded that they were still evaluating Plaintiff's mitigation efforts and had not yet deposed Plaintiff. Doc. No. [103], ¶¶ 42, 43. In response to Defendant Taylor's interrogatory regarding whom Plaintiff contacted about potential employment, Plaintiff responded in pertinent part:

> Plaintiff does not recall each and every contact that he made in his efforts to secure employment following his termination. In January of 2021, Plaintiff lost his job with Defendant. Until his POST record was clear, he was unable to work in law enforcement. Plaintiff called friends and law enforcement departments, including Lilburn and Athens-Clarke County, to try to find work, but they required that he clear his record before being able to hire him.

Doc. No. [111-1], ¶ 14.

## III.   REPORT & RECOMMENDATION

In addressing Defendants' Motion for Summary Judgment (Doc. No. [90]), the Magistrate Judge found that there remained questions of fact as to whether Plaintiff can establish a convincing mosaic of discrimination (Doc. No. [123], 43–46). Recognizing that that racial discrimination in public employment violates

25

clearly established constitutional law, the Magistrate Judge concluded that the individual Defendants were not entitled to qualified immunity as a matter of law since Plaintiff presented genuine issues of material fact on whether Defendants' stated reasons for terminating Plaintiff amounted to pretext for racial discrimination. Id. 56–69. Finally, the Magistrate Judge found that Defendants were final decisionmakers as to Plaintiff's termination. Id. at 59–61.

With respect to Plaintiff's Motion for Summary Judgment (Doc. No. [91]), the Magistrate Judge recommended granting the motion as to Defendants' ninth affirmative defense, which is Defendant's assertion that Plaintiff failed to mitigate damages. Doc. No. [123], 61–67. On the other hand, the Magistrate Judge recommended denial of summary judgment to Plaintiff as to Defendants' tenth affirmative defense, which pertains to after-acquired evidence. Id. at 67–70.

## IV.    OBJECTIONS

Defendants do not object to the Magistrate Judge's recommendation that summary judgment be denied as to Plaintiff's official capacity discrimination claim brought under the convincing mosaic theory. Likewise, Defendants do not object to the Magistrate Judge's recommendation that Plaintiff is entitled to summary judgment as to Defendants' ninth affirmative defense (failure to mitigate damages). The Court has reviewed those portions of the R&R for clear

error and finds none. Therefore, the recommendations that (1) Defendants'

Motion for Summary Judgment be denied as to the official capacity

discrimination claim, and (2) Plaintiff's Motion for Summary Judgment be

granted as to Defendants' ninth affirmative defense are **ADOPTED**.

Defendants object to the recommendation that they are not entitled to

qualified immunity on Plaintiff's individual capacity claims (Doc. No. [125]), and

Plaintiff objects to the recommendation that he is not entitled to summary

judgment on Defendant's affirmative defense regarding after-acquired evidence

(Doc. No. [127]). The party objecting to the R&R has the burden of specifying with

particularity the alleged error(s) made. See Macort, 208 F. App'x at 784 ("It is

critical that the objection be sufficiently specific and not a general objection to the

report."). To be specific, an objection must refer to particular findings in the R&R

and assert the precise basis for objection. Heath v. Jones, 863 F.2d 815, 822 (11th

Cir. 1989); Sledge v. PHH Mortg. Corp., No. 1:22-CV-1704-WMR, 2023 WL

2949989, at *2 (N.D. Ga. Jan. 25, 2023).

### A.    Defendants' Objections: Qualified Immunity

While Defendant couches their objections in terms of qualified immunity,

they do not contest that it is clearly established that a public employer who

terminates an employee on the basis of race violates that employee's

constitutional rights. Doc. No. [125], 8–9. Instead, Defendants argue that the Magistrate Judge defined clearly established law at too high a level of generality. Id. They then go further to offer a brand new theory in support: that Plaintiff cannot demonstrate that Defendants knew that their actions amounted to constructed discharge of Plaintiff, which in turn means that they did not know their actions violated clearly established rights. Id. at 10–17. Defendants give no explanation why this argument was not raised before the Magistrate Judge. Rather, they simply urge this Court to exercise its discretion to entertain new arguments at this stage of the litigation. Id. at 17–18.

This Court "has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." Williams v. McNeil, 557 F.3d 1287, 1290-92 (11th Cir. 2009). Exercising that discretion, the Court rejects Defendants' efforts to relitigate their qualified immunity argument under a new theory. In this case, the Court has adopted the well-reasoned recommendation of the Magistrate Judge on the discrimination claim—to which there was no objection. This means that a factfinder will determine whether Defendants terminated Plaintiff on the basis of race. Thus, there is at least a possibility for a factfinder to determine that that the actions of Defendants did amount to a termination and that it was on the basis of Plaintiff's race. As such,

28

the Court cannot find that Defendants were not on notice that such action would violate Plaintiff's clearly established rights. In other words, this Court agrees with the Magistrate Judge that the existence of the question of fact on racial discrimination in public employment coupled with clear precedent that racial discrimination in public employment violates clearly established constitutional rights precludes summary judgment as to qualified immunity in this instance.

Accordingly, Defendants' objections related to their entitlement to qualified immunity are without merit.

### B.     Plaintiff's Objections: After-Acquired Evidence

Plaintiff objects to the Magistrate Judge's conclusion that whether Defendants would have terminated him for secretly recording the March 22, 2021 meeting with Atwater is a question of fact. Doc. No. [127]. The objection is based on the uncertainty of the Merit Board appeal process: Plaintiff asserts that without certainty of the Merit Board upholding termination for the secret recording, Defendants' affirmative defense of after-acquired evidence must fail. Id. at 5–6. In response, Defendant points out that Plaintiff has not established that he would have in fact appealed a notice of intent to termination; after all, he did not do so with regard to the underlying notice of intent to terminate. Doc No. [129], 6. Instead, he chose to resign.

The Court agrees with the Magistrate Judge that the ultimate outcome of Plaintiff's actions in secretly recording the March 22, 2021 meeting is rife with factual issues that cannot be resolved at summary judgment. Accordingly, Plaintiff's objections as to the denial of summary judgment on Defendants' tenth affirmative defense, after-acquired evidence, are without merit.

## V.   CONCLUSION

Defendants' Motion for Leave to File a Reply (Doc. No. [130]) is **GRANTED**. The reply was considered by the Court.

Defendants' objections (Doc. No. [125]) and Plaintiff's objections (Doc. No. [127] are **OVERRRULED.** The R&R (Doc. No. [123]) is **ADOPTED** as the order and opinion of this court. The Parties shall file their Proposed Consolidated Pretrial Order within thirty days of the date of this Order.


**IT IS SO ORDERED** this 13th day of March, 2025.


/s/ Steve C. Jones
**HONORABLE STEVE C. JONES**
**United States District Judge**

30